UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**CYNTHIA C. KESSLER, et al.**                               **CIVIL ACTION**

**versus**                                                   **NO. 03-2883 c/w 04-0976**

**NICHOLAS P. POPICH, et al.**                               **SECTION "C" (5)**

## OPINION

This matter was tried before the Court without a jury on May 11, 2006, and taken under advisement. Having considered the testimony and evidence adduced at trial, the record, and the law, the Court finds that Cynthia Kessler ("Kessler") and Mark Tessier ("Tessier") entered into a valid oral contract with Nicholas Popich ("Popich"). The Court further finds that Tessier and Kessler are entitled to the amount owed to them under the contract; Tessier is owed $86,892.28 for the period between May 1, 2002 and October 31, 2002 (Ex. 22) and Kessler is owed $48,187.71 for the period between May 15, 2002 and October 31, 2002 (Ex. 21). The Court also finds that Tessier's claims for false arrest, malicious prosecution, and defamation claims against Popich are without merit.

The trial consisted of three witnesses, Mark Tessier, Cynthia Kessler, and Nicholas Popich.

At trial, Tessier testified that he first met Popich in September 2001, where they discussed the possibility of Tessier working on raising funding for a company, Biological Processors of America ("BPA"), a maritime based floating waste processing facility that was to be controlled and founded by Popich. (Tr. Transcript at 8-11.) Popich told Tessier that he would put in five hundred thousand dollars into BPA as seed money, and that he wanted Tessier to work on raising five million dollars in capital to complete the feasibility study for the project, and become the CEO of BPA. (Tr. at 11-14.)

Tessier began to work for Popich, setting up meetings for potential investors, and, in January, 2002, Tessier began to work from an office space located on real estate owned by Popich. (Tr. Transcript at 12-15.) From January 2002, to early May 2002, Tessier worked out of the office trying to obtain funding for BPA. (Tr. Transcript at 14-18.) When Tessier raised the issue of compensation, Popich told him that "he was waiting for a pre-feasibility study to be completed." (Tr. at 15.) Tessier also raised the issue that BPA needed a CFO, and suggested Kessler. (Tr. at 15-16.)

Sometime during January-April, Tessier and Kessler met with Popich, who agreed that she should be the CFO of BPA. (Tr. at 15-16.)  Kessler began to come to the office space. (Tr. at 16.) Tessier and Kessler determined that they needed "something definitive on the table as far as getting compensated" and each of them drafted an employment agreement. (Tr. at 16.) Tessier discussed the agreement with Popich several times, and edited his agreement according to Popich's suggestions. (Tr. at 17, 78.) According to the agreements, Tessier was to be employed as the CEO of BPA, and Kessler was to be employed as the CFO of BPA. (Exs. 1-2.) These agreements were never signed by Popich, nor were they signed by any other representative of BPA. Tessier then

2

scheduled a meeting with Kessler and Popich at Andrea's Restaurant, and the three met there on either May 1 or 2, 2002. (Tr. at 17-18.) At the meeting, Tessier and Kessler discussed that they "wanted immediately to go on the payroll and to be paid." (Tr. at 18, 125.) At that point, according to Tessier, Popich stated "Yes, I guarantee it; you will be paid." (Tr. at 18.) Tessier testified that his annual salary was to be $175,000.00 plus allowances, starting from May 1, 2002. (Tr. at 20, 78-79.) Kessler testified that her annual salary was to be $120,000.00, starting from May 15, 2002 (Tr. at 125.) When asked on cross-examination about the contract, Tessier stated the following:

> My testimony is that I was solicited by Popich to work for BPA and we agreed on terms. The - - and we had not signed the agreement and we made - - we had an agreement, however, between ourselves that he would personally make the payments. He guaranteed it.

(Tr. at 64.) Kessler confirmed Tessier's testimony concerning the meeting. (Tr. at 125-129.)

Tessier testified that he continued to work for Popich over the next several months, and Kessler testified that she began to work full time on May 15, 2002. (Tr. at 18-19, 138.) After the meeting with Popich, Tessier and Kessler testified that they began to submit invoices and receive compensation from Popich, although never in the full amount billed on their invoices. (Tr. at 19-20, 127-131.) Further, the checks were not paid from BPA, nor Popich, but were paid to Tessier and Kessler from Global Remediation, Inc., another company owed by Popich. (Tr. at 67, 131.) According to Tessier, when he asked Popich about the money owed to him, Popich stated that he was refinancing some real estate and, from the refinancing, expected to put the five hundred thousand dollars in seed money into BPA. (Tr. at 19-20.) Tessier and Kessler would be paid from the seed money. (Tr. at 19-20.) Kessler also testified that she would regularly speak with Popich

3

about compensation and the he constantly reassured her that he would pay her. (Tr. at 125-129, 139-141.)

From the exhibits submitted at trial, it appears as though Popich sent Tessier a letter on October 9, 2002, stating that he did "not feel that Global Remediation is in a position to continue to finance its related companies. Therefore, I must ask you to suspend our consultancy agreement until we are in a better position to move forward. . . Please submit your invoice for time spent and please give some consideration to our financial plight and I will make every effort to see that they are paid as promptly as possible." (Ex. 19.) The refinancing on the real estate fell through, and by October 31, 2002, Tessier testified that he received a letter from Popich stating that he had to "stop the bleeding," and that, until further notice, he could not pay him. (Tr. at 22.)

In spite of this, Tessier continued to work for Popich until March 2003. (Tr. at 31, 45.) Tessier stated that, on the face of the agreement, he expected to be paid pursuant to the agreement until October 31, 2002. (Tr. at 50.) After October 31, 2002, Tessier stated that he expected to be paid "as a result of getting the financing on the table." (Tr. at 51, 79-80.) According to time keeping records of BPA, the amount of Tessier's unpaid invoices totaled $86,892.28. (Ex. 22.) There also appears to be some Human Resources Forms for BPA, which listed various options to arrange for their payment. (Ex. 5.)

Kessler testified that she learned of the "stop the bleeding" letter through Tessier, and stopped working on October 31, 2002. (Tr. at 139.) According to time keeping records of BPA, the amount of Kessler's unpaid invoices totaled $48,187.71. (Ex. 21.) The record also reveals that, in response to one of her requests for payment on October 8, 2003, Popich wrote to Kessler on October

4

29, 2003, stating, "We continue to pursue the BPA project and if some of the verbal commitments that have been made to use come to pass, all should end well." (Ex. 35.)

In August or September 2002, Tessier became aware that Popich had previously been convicted of a felony, and went to Popich with this information. (Tr. at 25-26.) Tessier informed Popich that he would either have to disclose this information to potential investors, or restructure BPA so that Popich was not the direct owner. (Tr. at 26-45.) Tessier worked to secure loans for the restructuring and made a final proposal to Popich in March, 2003. (Tr. at 26-45.) Ultimately, Popich rejected both options, and Tessier resigned on March 31, 2003. (Tr. at 45, 80.)

Due to a demand letter written by Tessier to Popich, combined with statements indicating that Tessier would go to Popich's investors with the information that he had a prior felony conviction, extortion charges were initiated by the District Attorney's Office against Tessier. (Tr. at 46-50, 80-86; Exs. 29, 32.) From the exhibits, and Popich's testimony at trial, it appears that Tessier demanded payment of unpaid compensation, and if he did not receive payment, would proceed to notify potential investors that Popich was a convicted felon. (Exs. 29, 32.) The charges were ultimately dismissed by the state court, and the ability of the Assistant District Attorney to appeal the dismissal expired on December 31, 2003. (Tr. at 48-49.) According to Tessier, he was unable to work until December 31, 2003 because of the pending charges. (Tr. at 49-50.)

At trial, Popich testified that he owned Global Remediation, Inc., and that Global Remediation made payments to Tessier and Kessler, but that the checks were to defray expenses, not to compensate for salary. (Tr. at 90-91, 93.) On October 31, 2002, he wrote Tessier a "letter ending the arrangement we had." (Tr. at 94.) Popich also testified that he never had conversations

with Kessler concerning her salary, but that he supposed they "had some conversations about her compensation eventually." (Tr. at 97.) Popich did not remember many things at trial, including how, exactly, the charges for extortion were brought against Tessier, although it is clear that Popich provided documentation to either his attorney or the prosecutor's office. (Tr. at 97-101, 106-122.) Popich attributes his memory loss to his open heart surgery, which occurred two or three years ago. (Tr. at 100-101.)

### Tessier and Kessler Contract Claims

Tessier and Kessler contend that they each individually entered into a valid oral contract with Popich, starting on May 1, 2002 and May 15, 2002, respectively, and that he agreed to pay them for their work done in connection with fund raising for BPA. Their agreements with Popich, as they existed at the time, both ended on October 31, 2002. Tessier contends that he was to be paid an annual salary of $175,000.00. The unpaid amount submitted through invoices by Tessier from the period of May 1, 2002 to October 31, 2002 is $86,892.28. Kessler states she was to be paid an annual salary of $120,000.00. The unpaid amount submitted through invoices by Kessler from the period of May 15, 2002 to October 31, 2002 is $48,187.71.

Under La. C.C. Art. 1978, a "contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement." *See also Vezina and Assocs. v. Gottula*, 652 So.2d 85 (La. App. 5th Cir. 1995). The contracting party is called a "stipulator" or "promisee," and the other party is called the "promisor." 5 La. Civ. L. Treatise, Law of Obligations § 10.33 (2d ed.); *Joseph v.*

6

*Hospital Service District No. 2 of the Parish of St. Mary*, 923 So.2d 27, 33 (La. App. 1st Cir. 2005). This type of contract is called a *stipulation pour autrui*.

A state court set forth the appropriate test to determine whether a *stipulation pour autrui* was created:

> "[To determine whether an] advantage in favor of a third party beneficiary has been provided by a contract between others (referred to as the 'stipulator' or 'promisee' and 'promisor'), we look to (1) the existence of a legal relationship between the promisee and [promisor] involving an obligation owed by the promisee to the beneficiary; (2) the existence of a factual relationship between the promisee and [promisor], where, (a) there is a possibility of future liability either personal or real on the part of the performance of the promisee to the beneficiary against which the performance of the promisee [sic] will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended. [T]he true third party beneficiary is never a party to the contract. He is never a promisee. The promisee is the stipulator and the promise runs to him [the promisee] and is merely in favor of the third party."

*Joseph*, 923 So.2d at 33 (internal citations ommitted); *Andrepont v. Acadia Drilling Co.*, 231 So.2d 347 (La. 1969).

A *stipulation pour autrui* is "never presumed;" the "intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear." *Boyte v. Louisiana AG Credit, PCA*, 899 So.2d 765, 769 (La. App. 2d Cir. 2005); *Scaffidi and Chetta Entertainment v. University of New Orleans Foundation*, 898 So.2d 491, 495 (La. App. 5th Cir. 2005). The "benefit in favor of a third party beneficiary may be implied from a consideration of the agreement as a whole, as well as by express stipulation." *Joseph*, 923 So.2d at 34.

There is "no requirement that the contract be written." *Joseph*, 923 So.2d at 32-33. Because the value of the contracts at issue here are "in excess of five hundred dollars, the

7

contract must be proved by at least one witness and other corroborating circumstances." La. C.C. Art. 1846. The party demanding performance of the contract bears the burden of proving the existence of the obligation. *Boyte*, 899 So.2d at 769; *Scaffidi*, 898 So.2d at 495. A "party to a lawsuit may serve as his own credible witness." *Hurston v. Hurston*, 417 So.2d 407, 408 (La. App. 1st Cir. 1982.) "Corroborating circumstances" may be "general and need not support or prove every detail of plaintiff's case. The trier of fact has much discretion in determining what evidence is corroborative of plaintiff's case." *B.M. Albrecht Electric, Inc. v. Griffin*, 413 So.2d 246, 247 (1982). Whether a contract is a *stipulation pour autrui* is a question of fact for the trial court to determine. *See Vezina and Assocs.*, 652 So.2d at 89.

The Court finds that Popich entered into two district and separate *stipulation pour autrui* contracts as promisor, with Kessler and Tessier as promisees/stipulators, to provide a benefit for BPA, the third party beneficiary.[1] Popich entered into an oral agreement with Kessler and Tessier, to pay them for fund raising work they did for BPA. At the time of the agreement, the corporate entity, BPA had no funds in its bank account; it was unable to pay Tessier and Kessler. Popich, as its representative, knew that it did not have adequate funding to pay Kessler and Tessier, and, due to its lack of funding, BPA was never made a party to oral agreement entered into at Andrea's restaurant. Popich, having a personal interest as the owner and representative of

---

[1] The Court does not find that Kessler and Tessier entered into an employment agreement with BPA directly, and that Popich agreed to act as a surety for BPA. *See Vezina and Assocs. v. Gottula*, 652 So.2d 85, 89 (La. App. 5th Cir. 1995) (distinguishing the two different types of contracts). Nor does the Court find, as Tessier claims, that Popich entered into an implied contract with Tessier to accept any reasonable restructuring plan; thus, Popich does not owe Tessier for one year's worth of salary. (See Rec. Doc. 53 at 6-7.)

BPA, agreed to pay Tessier and Kessler for the work that they did on BPA's behalf, to be compensated at an annual rate of $175,000 and $120,000, plus expenses, respectively. This agreement is evidenced by both the testimony of Kessler and Tessier. It is also evidenced by corroborative documentation submitted at trial, including the following: (1) invoices submitted by Kessler and Tessier; (2) BPA's Human Resources time keeping reports, which evidence that Kessler and Tessier were paid by another one of Popich's companies and were owed certain amounts for their work; (3) a letter from Popich to Kessler indicating that "all would end well" with respect to her request for payment (Ex. 35); and (4) a letter from Popich to Tessier asking him to submit his invoices for "time spent" and stating that he would make "every effort to see that they are paid as promptly as possible" (Ex. 19). The intent of Popich, Kessler, and Tessier, to stipulate a benefit in favor of BPA is manifestly clear when the context in which the agreement was made is considered as a whole.

The contract was terminated on October 31, 2002, when Popich, both personally, and as representative of BPA, communicated to Tessier and Kessler that he would be unable to pay them further. At that point, Kessler stopped working, and Tessier continued to work for Popich and on behalf of BPA, with the understanding that he would be paid only if funding came through. The Court finds that the amount owed to Kessler for the period between May 15, 2002 and October 31, 2002 is $48,187.71, and the amount owed to Tessier for the period between May 1, 2002 and October 31, 2002 is $86,892.28.

## Tessier Arrest Claim

With respect to Tessier's arrest claim, Tessier argues that his rights were violated because

Popich conspiring with one or more law enforcement officers to initiate Tessier's arrest and prosecution on the extortion charge. This Court presumes that Tessier is suing Popich under 28 U.S.C. § 1343,[2] which allows an individual to "recover damages for injury to his person. . ., or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in 42 U.S.C. § 1985." In the Fifth Circuit, to establish a claim under 42 U.S.C. § 1985,[3] a plaintiff must prove the following four requirements:

> "(1) the defendants must conspire
> (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and
> (3) the defendants must act in furtherance of the object of the conspiracy, whereby
> (4) one was (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States."

*McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 923 (5 Cir. 1977).

Regardless of whether there was probable cause to arrest Tessier on extortion,[4] Plaintiff

---

[2] Plaintiff states that 28 U.S.C. § 1343 is a basis for federal jurisdiction in this matter. (Civ. No. 04-0976, Rec. Doc. 1 at 1.)

[3] 42 U.S.C. § 1985 provides: "(3) Depriving persons of rights or privileges: If two or more persons in any State or Territory conspire. . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

[4] The state court dismissed the extortion charges against Tessier because it found there could not be an extortion charge for threatening to disclose public information; because Popich's

10

did not provide any evidence at trial that Popich entered into a conspiracy with another person to cause him to be unlawfully arrested and prosecuted. Because Tessier has not met his initial burden, the Court finds this claim to be without merit.

## Tessier Malicious Prosecution Claim

Tessier also claims that Popich caused him to be prosecuted for extortion under state law, and that the prosecution was malicious to the extent that its goal was to silence Tessier. (Civ. No. 04-0976, Rec. Doc. 1 at 3.) Under Louisiana law, "a malicious prosecution claim requires: 1) the commencement of an original criminal or civil judicial proceeding; 2) its legal causation by the present defendant against the present plaintiff who was the defendant in the original proceeding;

---

criminal history was public information, Tessier could not have been guilty of extortion for threatening to reveal it. (Ex. 46.) However, the court in *State v. Sharlhorne*, 554 So.2d 1317, 1321 (La.App. 1 Cir. 1989) noted the following:
    "Extortion is defined in LSA-R.S. 14:66, in pertinent part, as follows: Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. The following kinds of threats shall be sufficient to constitute extortion: (1) A threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him; (2) A threat to accuse the individual threatened or any member of his family or any other person held dear to him of any crime; (3) A threat to expose or impute any deformity or disgrace to the individual threatened or to any member of his family or to any other person held dear to him; (4) A threat to expose any secret affecting the individual threatened or any member of his family or any other person held dear to him; (5) A threat to do any other harm."
    Because Tessier has failed to meet his burden of proof at trial, this Court finds it unnecessary to reach the issue of whether there was probable cause for Popich to turn over the correspondence to the district attorney's office. However, a review of the case law and the record indicates that there likely was probable cause for both Popich, and the police, to initiate extortion charges against Tessier. According to the written correspondence and testimony at trial, Tessier was demanding that Popich pay him money owed; if not, he would send letters to potential investors disclosing that Popich was a convicted felon. This might qualify as a threat to "do any other harm" to Popich, "with the intention thereby to obtain anything of value," namely, his payment he believed was owed to him.

11

3) its bona fide termination in favor of the present plaintiff; 4) the absence of probable cause for such proceeding; 5) the presence of malice therein; and 6) damages conforming to legal standards resulting to the plaintiff." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 435 (5th Cir. 2000). "Malice and probable cause are issues of fact to be determined by the trier of fact, unless only one conclusion can be drawn from the evidence." *Williams v. DiVittoria*, 777 F.Supp. 1332, 1337 (E.D.La. 1991).

"Probable cause, or the lack of it, for purposes of a malicious prosecution action, depends on whether the circumstances of the particular case were such as to create an honest and reasonable belief in the mind of the defendant, at the time he charged the plaintiff, that the plaintiff was guilty of the crime." *Id*. at 1339. There are four ways to establish malice: (1) "a plaintiff proves malice if she can show that the defendant, in bringing the proceedings at issue, acted with any feeling of hatred, animosity, or ill will toward the plaintiff;" (2) "a defendant acts with malice when he uses the prosecution for the purpose of obtaining any private advantage;" (3) "a charge is malicious if the defendant made it with knowledge that it was false, or with reckless disregard for the charge's truth or falsity;" (4) "a court may infer malice when there was a conspicuous lack of probable cause for the charges at issue." *Id*. at 1137-1138 (internal citations omitted).

"[I]f the charges are dismissed before trial, a presumption arises that the defendant acted both without probable cause and with malice. In such cases the burden shifts to the defendant to prove the presence of probable cause and the lack of malice." *Id.* at 1338 (internal citations omitted). However, a defendant may argue that he "has communicated to his counsel all the facts

3) its bona fide termination in favor of the present plaintiff; 4) the absence of probable cause for such proceeding; 5) the presence of malice therein; and 6) damages conforming to legal standards resulting to the plaintiff." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 435 (5th Cir. 2000). "Malice and probable cause are issues of fact to be determined by the trier of fact, unless only one conclusion can be drawn from the evidence." *Williams v. DiVittoria*, 777 F.Supp. 1332, 1337 (E.D.La. 1991).

"Probable cause, or the lack of it, for purposes of a malicious prosecution action, depends on whether the circumstances of the particular case were such as to create an honest and reasonable belief in the mind of the defendant, at the time he charged the plaintiff, that the plaintiff was guilty of the crime." *Id*. at 1339. There are four ways to establish malice: (1) "a plaintiff proves malice if she can show that the defendant, in bringing the proceedings at issue, acted with any feeling of hatred, animosity, or ill will toward the plaintiff;" (2) "a defendant acts with malice when he uses the prosecution for the purpose of obtaining any private advantage;" (3) "a charge is malicious if the defendant made it with knowledge that it was false, or with reckless disregard for the charge's truth or falsity;" (4) "a court may infer malice when there was a conspicuous lack of probable cause for the charges at issue." *Id*. at 1137-1138 (internal citations omitted).

"[I]f the charges are dismissed before trial, a presumption arises that the defendant acted both without probable cause and with malice. In such cases the burden shifts to the defendant to prove the presence of probable cause and the lack of malice." *Id.* at 1338 (internal citations omitted). However, a defendant may argue that he "has communicated to his counsel all the facts

bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence and inquiry, and has acted upon the advice received honestly and in good faith." *Eusant v. Unity Industrial Life Ins. and Sick Ben. Ass'n of New Orleans*, 195 La. 347, 353 (La. 1940). In this situation, "the absence of malice is established, the want of probable cause is negatived, and the action for malicious prosecution will not lie." *Id*. Although this defense is strongest when a defendant has consulted the public prosecutor, the defendant can still avail himself of this defense if he has consulted only his private counsel. *Id*.

Tessier has supplied the Court with a copy of the transcript from the state proceedings on his Motion to Quash the indictment for extortion, which establishes that a criminal proceeding was commenced, and that Popich was the complaining victim. (Ex. 46.) However, Popich testified at trial that he turned over Tessier's correspondence to either his attorney or to the public prosecutor, who initiated the prosecution; thus, the absence of malice is established.[5] Therefore, the Court must deny this claim as without merit.

### Tessier Defamation Claim

Tessier also argues that Popich's instigation of criminal charges constitute defamation per se, and that falsity, malice, and damages should be presumed. Tessier also states that the charges were public, did not involve a matter of public interest, and were defamatory. (Civ. No. 04-0976, Rec. Doc. 1 at 3.) Tessier argues that criminal accusations are defamatory per se, and, as a result, malice and falsity are presumed. (Civ. No. 03-2883, Rec. Doc. 35, Mem. in Supp. at

---

[5] Additionally, because of the nature of the correspondence, this Court cannot find the existence of malice or the lack of probable cause in the initiation of the prosecution.

13

5.)

The court in *Williams v. DiVittoria*, 777 F.Supp. 1332, 1340 (E.D. La. 1991), stated:

> Under Louisiana law, a speaker is entitled to an absolute defense in a defamation action arising out of something he says in the course of a judicial or quasi-judicial proceeding, without regard to the speaker's notion of the truth or falsity of the statement. *See Goldstein v. Serio*, 496 So.2d 412, 414 (La.App. 4 Cir.1986), *writ denied,* 501 So.2d 208 (La. 1987), *writ denied*, 501 So.2d 209 (La. 1987).
> In *Goldstein*, the court held that a group of lawyers had no defamation claim against former clients who filed complaints against them with the Louisiana State Bar Committee on Professional Responsibility, although the complaints were later dismissed as groundless. *Id*. at 413-14. The court concluded that the clients were entitled to an absolute privilege defense to the defamation claims because the complaints were made in a quasi-judicial proceeding (an attorney disciplinary proceeding). *Id*. at 414.
> Similarly, an absolute privilege attaches to all of [the defendant's, a Louisiana sheriff deputy,] statements made in filing the charges against plaintiff. Because plaintiff's defamation claim is based solely on the assertion that [the defendant] falsely accused her of crimes, and because he made all the alleged statements in the course of judicial proceedings charging plaintiff with those crimes, her complaint on this cause of action must be summarily dismissed.

Under Louisiana law, Popich cannot be liable for defamation in this matter because he made the allegedly defamatory statements in a judicial proceeding by instituting charges against Tessier. Tessier has provided no case law to the contrary.[6]

## Conclusion

In light of the foregoing,

IT IS ORDERED that judgment be entered in favor of the Plaintiffs Cynthia Kessler in

---

[6] Tessier cited to *Melancon v. Hyatt Corp.*, 589 So.2d 1186 (La. App. 4th Cir. 1991) as support for this claim. However, this case addresses a situation in which an employer accused an employee of stealing towels and fired the employee for that reasons and no criminal charges were ever instituted. In such a situation, where no criminal charges are instituted, a criminal accusations may be per se defamatory, but this case has no bearing on the matter before the Court, in which criminal proceedings were instituted.

the amount of $48,187.71 and Mark Tessier in the amount of $86,892.28.

New Orleans, Louisiana, this 4th day of August, 2006.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

15